IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RODNEY A. HYSELL,**

      **Plaintiff,**

                                                   Civil Action 2:14-cv-587
  v.                                          Judge Edmund A. Sargus
                                                   Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Rodney A. Hysell, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Social Security Disability Insurance Benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 8).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I. BACKGROUND

Plaintiff filed his applications for benefits on September 2, 2010, alleging that he has been disabled since August 15, 2008 as a result his visual impairments.[1]  Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

---

[1] Plaintiff only seeks benefits for the period beginning September 2, 2010, the date of his first medical visit that is included in the record in this action. (Pl.'s St. or Errors 2, ECF No. 11.)

Administrative Law Judge Nino A. Sferrella (the "ALJ") held a hearing on February 7, 2012, at which Plaintiff and Vocational Expert Jerry A. Olsheski, Ph.D. appeared and testified. (R. at 64-98.) On November 28, 2012, the ALJ held a supplemental hearing at which Plaintiff, Medical Expert Dr. Richard Simmons ("ME"), and Vocational Expert Bruce Walsh Ph.D. ("VE"), appeared and testified. (R. at 36-61.) On December 13, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 22-30.) On April 24, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-3.) Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff testified that his vision has gradually deteriorated. (R. at 70.) He testified that in 2000, he had surgery as a result of a retinal tear in his right eye. He also explained that he had a cataract removed from his right eye in December 2011, and that he currently has a cataract in his left eye. (R. at 70-74.) Plaintiff stated that before the cataract was removed, his right eye was "totally useless" and he had trouble walking on anything but flat surfaces. (R. at 73-74.)

When explaining his current symptoms, Plaintiff testified that he has "floaters . . . even though both eyes are totally different . . . one of them is like cobwebs, small, everywhere, almost can't avoid them. My right eye is kind of like a big translucent chunk that sort of stays together and . . . like spins around my eye." (R. at 73.) He also explained that he sees light flickering out of the corners of his eyes and that "if [he] looks at sharp angles, especially down, it's like the muscle pulls [his] eye . . . it's like it sort of stretches [his] eye. . . . it changes the shape of the

2

image that [he is] seeing." (R. at 77, 81-82.) He testified, however, that he has "close to full range" and can "pretty much see" out of his peripheral vision. (R. at 76.)

Plaintiff testified that no doctor has recommended any treatment for his complaints of blurred vision, shadows, floaters, occasional flashes, photophobia, or itchiness. (R. at 82.) He stated that he quit driving but that "was more or less [his] idea." *Id.* He testified that he allowed his driver's license to expire in 2008 because he was having difficulty with depth perception when driving. Plaintiff also stated that he wears dark glasses when he leaves the house because he does not like bright lights. When he is in the house, he keeps the curtains drawn shut and uses a dim, forty watt light bulb. (R. at 77-78.) Plaintiff testified that he received no treatment other than cataract removal in his right eye between September 2010 and November 2011. (R. at 83.)

When asked how often he has problems with blurry vision, Plaintiff testified that he has problems to some degree almost every day. (R. at 86.) He also testified that he is able to read if he keeps material about eighteen inches away from his face and that his eyes would not bother him if he read a couple of sentences, but they would bother him if he read a paragraph. *Id.* He further stated that he has double vision to some degree, has tried to pick things up and missed, has bad hand-eye coordination, and bad depth perception. (R. at 87.) He stated that he "sort of" watches television, but mostly watches talk shows where he more or less can just listen. *Id.* Plaintiff testified that he does not think he could work consistently due to his visual impairments.

**B.  Medical Expert Testimony**

The ME testified that Plaintiff did not meet the requirements for listing 2.02 or 2.03, blindness and limited vision. (R. at 43.) He explained, however, that the intraocular lens that was placed in Plaintiff's eye during the cataract surgery may be causing some of his symptoms.

3

(R. at 42.) He also testified that Plaintiff's loss of depth perception could be explainable, stating as follows:

> It has to do with the way the eye focuses light rays, and, obviously, he's had a cataract with an intraocular lens in the right eye and then a slight cataract in the left eye with 20/30 vision.
>
> And when you have a cataract and you have that removed, the optics are not the same as if you had your own lens. And sometimes there's an image disparity in terms of size. And it's hard for the brain to integrate these two images and I think that's probably what's responsible for his lack of depth perception.
>
> And I'm sure this lack of depth perception makes him fearful for driving because he's not recognizing depths. If you're only born with one eye, you're used to using that eye to judge depth by sizes. Something that's closer is bigger and something that's smaller is farther away. Since he's never had this limitation of just using one eye, now he's confused and I think that this explains why he's fearful of depth and driving and this will, obviously impair his ability to do certain jobs.

(R. at 44.) The ME stated that most people do well with the intraocular lens, but problems may exist, such as difficulties with depth perception, when it is inserted in only one eye. *Id.*

The ME also explained why Plaintiff's vision may appear "cobwebby" or like a snow globe. He stated that

> Many people, as they age, will describe floaters. And floaters are the result of – you have to understand a little bit about the anatomy of the eye. The front part of the eye has a cornea, then right behind the cornea is the aqueous fluid, and right behind the aqueous fluid is the lens. And the lens is what causes – what turns into a cataract and which he's had removed. But the whole big volume of the eye, between the lens and the back of the eye . . . it's filled with things called vitreous. . . . And in young people, the vitreous is a gel, very stable, but as we age, and it can start really at any age . . . there can be liquid—there can be condensation, liquefaction. The vitreous can change into little strands and that's what causes these floaters. . . .

(R. at 46-47.) He further stated that "floaters are a real problem, no question about it." *Id.*

4

He explained, however, that most people that have floaters are not impaired. (R. at 48.) He opined that Plaintiff's symptoms may be emotional/psychological rather than physical. *Id.* The ALJ asserted, "how much of it is that just [he] doesn't want to work and this is bothering him or whatever. A lot of people have floaters and they just deal with it and they get on and they do their work. So, there's no objectivity to this. There's no way to measure this." *Id.* He stressed that for most people, floaters will not prevent them from doing reasonable work. He stated, however, that if an individual is under significant stress, the symptoms may seem magnified. *Id.* The ME testified that the symptoms Plaintiff complains of are not issues of visual acuity.

The ME further testified that Plaintiff could have a virectomy, a procedure where a retinal surgeon would go in and remove the vitreous strands, to correct the floaters if they are as bad as Plaintiff suggests. (R. at 51.) The ME pointed out that the record in this case does not say how bad Plaintiff's vitreous is or describe the severity of his symptoms. (R. at 51, 55.) He explained that Plaintiff could go to a retinal expert to find out how significant his floaters are. (R. at 55.) The ME concluded:

> I don't think the medical record has carefully looked at the floaters as a significant issue. And, even though it's described, this is historical. When a patient walks into a doctor's office and says I have floaters, he writes down floaters. But then there is no objective examination that's done to say these are these significant . . . how bad are they, and that's what's missing from the record.
>
> \*   \*   \*
>
> But we don't have an examination that says this man has significant vitreous opacities, vitreous floaters. We don't see that in the medical record.

(R. at 55-56.)

5

Given the lack of medical evidence, the ME testified that he cannot quantify how often Plaintiff's symptoms occur. The ME also stated that the record does not explain the cause or significance of Plaintiff's alleged photophobia. (R. at 57.)

Finally, the ME suggested that motivation is an issue in this case. He stated that "if he [Plaintiff] wants to work, he'll work. He'll . . . deal with it. If he doesn't want to work, if he's tired of living and wants to just vegetate, then it's going to bug him. So motivation is, is going to be key here." (R. at 54.) When asked what types of abilities and limitations Plaintiff would have in a work setting, the ME stated that Plaintiff ought to be able to see small things, but that anything involving heights, depth, balance, or driving a motor vehicle would be problematic for him. (R. at 45-46.)

**C.  Vocational Expert Testimony**

The VE testified that an individual with the limitations described by Plaintiff would not be able to sustain competitive employment on a long term basis without accommodations for time off work or unscheduled breaks. (R. at 53-54.)

### III.  RELEVANT MEDICAL RECORDS

The medical records indicate that Plaintiff first received treatment from Dr. Justice for his visual impairments on September 2, 2010. (R. at 268.) Plaintiff reported blurred vision, shadows, floaters, occasional flashes, photophobia, and itchiness. *Id.* Dr. Justice noted that Plaintiff was a glaucoma suspect, and had a cataract, myopia, and a history of retinal tear. Plaintiff was not prescribed any treatment for his alleges symptoms. *Id.*

On November 11, 2011, Plaintiff was again treated by Dr. Justice. (R. at 273.) At this time, Plaintiff complained of floaters, distorted vision, double vision, and shadows that do not go

6

away when he closes his eye. Plaintiff reported that the symptoms were worse in his right eye and that he ignores that eye. *Id.*

On December 5, 2011, Plaintiff had surgery to remove a cataract from his right eye. Dr. Justice noted that he was "doing well" after the surgery. (R. at 278.) On December 6, 2011, Dr. Justice noted that Plaintiff was "doing great." (R. at 280.) On January 5, 2012, a month after his cataract surgery, Dr. Justice noted that Plaintiff feels like his vision has stayed steady and that he has noticed "only some 'contrast changes' when light hits his [right] eye from the side." (R. at 276.)

On April 24, 2012, Sarah Yoest O.D., conducted a ophthalmological/optometric consultative examination of Plaintiff. (R. at 283-291.) Dr. Yoest noted that, with best correction, Plaintiff's visual acuity is 20/30 in his right eye and 20/40 in his left eye. (R. at 283.) She noted that Plaintiff has myopic degeneration in both eyes, loss of depth perception, flashes, floaters, and vitreous detachment. (R. at 283-84.) Dr. Yoest concluded that Plaintiff is able to avoid ordinary hazards, is able to read ordinary newspaper or book print, is able to view a computer screen, and is able to determine differences in shape and color of small objects such as screws, nuts or bolts. (R. at 288.) She concluded that Plaintiff is not able to read very small print. *Id.* She further opined that Plaintiff can occasionally be exposed to moving mechanical parts and occasionally can operate a motor vehicle, but can never be exposed to unprotected heights. (R. at 289.) Finally, Dr. Yoest found that Plaintiff can shop; travel without a companion; ambulate without using a wheelchair, cane, or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a

7

reasonable pace with the use of a single hand rail; prepare simple meals and feed himself; can care for his personal hygiene; and can sort, handle, use papers and files. (R. at 290.)

### IV. THE ADMINISTRATIVE DECISION

On December 13, 2012, the ALJ issued his decision. (R. at 22-30.) The ALJ found that Plaintiff met the insured status requirements through December 31, 2011. At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since August 15, 2008, the alleged onset date. (R. at 24.) At step two, the ALJ found that Plaintiff had the severe impairments of vision defect with myopic degeneration and cataract surgery of the right eye. (*Id.*) At step three, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four of the sequential process, the ALJ assessed Plaintiff's residual functional capacity ("RFC"). The ALJ explained as follows:

---

[2]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> After careful consideration of the entire record, the [ALJ] finds that the [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except: no reading of very small print; no working at unprotected heights; no more than occasional exposure to moving mechanical parts; and no more than occasional operation of motor vehicles.

(R. at 25.)  In reaching this RFC, the ALJ found that the "documented objective evidence does not substantiate the severity of the symptoms and degree of functional limitations, as alleged by the [Plaintiff]."  (R. at 26.)

At step four, relying on the VE's testimony, the ALJ determined that Plaintiff is not capable of performing past relevant work.  The ALJ concluded, however, that other jobs exist in significant numbers in the state and national economy that Plaintiff can perform based on the VE's testimony.  (R. at 28-29.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 30.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

9

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In his Statement of Errors, Plaintiff contends that the ALJ's credibility assessment is not supported by substantial evidence. More specifically, Plaintiff contends that the ALJ "placed undue emphasis on the fact that [Plaintiff's] visual acuity did not meet the requirements for the listing and quietly circumvented the real issue: Whether or not [Plaintiff's] other visual symptoms could be considered medically credible and, if so, whether those symptoms result in a significant impact upon Plaintiff's capacity to sustain employment." (Pl.'s St. of Errors 6, ECF No. 11.) Plaintiff stresses that "whether or not [his] examinations indicate perfect visual acuity is irrelevant since it is the residual symptoms with corrected visual acuity which preclude him

10

from being able to adequately utilize such vision in a work setting." *Id.* Thus, Plaintiff contends that the ALJ failed to give appropriate weight to Plaintiff's subjective complaints of floaters, flashing lights, loss of depth perception, etc., in assessing Plaintiff's RFC. The Undersigned disagrees.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he [or she] must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "'with respect to [a claimant's] subjective complaints of pain.'" *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial

11

evidence." *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *but see Storey v. Comm'r of Soc. Sec.*, No. 98-1628, 1999 WL 282700, at *3 (6th Cir. Apr. 27, 1999) ("[T]he fact that [the ALJ] did not include a factor-by-factor discussion [in his credibility assessment] does not render his analysis invalid.").

As a preliminary matter, a review of the ALJ's decision demonstrates that the ALJ considered all of the symptoms expressed by Plaintiff, including floaters, depth perception difficulties, and flashing lights, not just his visual acuity, in determining Plaintiff's RFC.  The ALJ concluded, however, that Plaintiff's subjective complaints and alleged limitations are only credible to the extent they are consistent with the above RFC.  The ALJ explained as follows:

> The [Plaintiff] has an underlying medically determinable impairment that could reasonably cause some symptomatology.  However, in this case a careful review of the record and testimony the [ALJ] finds the documented objective evidence does not substantiate the severity of the symptoms and degree of functional limitations, as alleged by the [Plaintiff].  The objective evidence fails to document the presence of any impairment that could reasonably be expected to result in

12

>symptoms of such severity or frequency as to preclude the range of work described above. . . .
>
>\* \* \*
>
>In addition to the general lack of objective evidence to support his subjective complaints, there are other considerations that weigh against the [Plaintiff's] overall credibility. For example, the [Plaintiff] had minimal eye treatment for an entire year from September 2010 to September 2011. Additionally, his field of vision and corrected vision, indicate that he can see with 20/30 vision in both eyes, but that he has depth perception limits, which is in conflict with his testimony of limited vision and frequent disturbances from floaters. Additionally, the [Plaintiff's] complaint of floaters interfering with his vision is not fully supported by the consultative examination report or by the medical expert, Dr. Simmons, who stated that floaters are normal after cataract surgery, but that people may be affected after surgery in different ways. Furthermore, there is no direct or suggested evidence that the [Plaintiff] needs to wear protective sunglasses, either indoors or outdoors, even though the [Plaintiff] testified that he wears dark glasses in order to protect his eyes from the light.
>
>The [Plaintiff's] daily activities, as described above, are not restricted to the extent that he would be precluded from the range of work assessed herein. The [Plaintiff] is able to read, use a computer, cook, clean, and take care of his own personal hygiene. He stated he has not driven a car since 2008.
>
>In summary, the location, duration, frequency, and intensity of the [Plaintiff's] alleged symptoms are adequately addressed in the above residual functional capacity. The objective evidence fails to document the presence of any impairment that could reasonably be expected to result in symptoms of such a severity or frequency as to preclude the range of work described above.
>
>Considering the medical evidence and opinions discussed above, as well as the [Plaintiff's] activities, the [ALJ] finds that the [Plaintiff's] subjective complaints and alleged limitations are not fully persuasive, and that he retains the capacity to perform work activities with the limitations set forth above.

(R. at 26-28.)

Contrary to Plaintiff's assertion, the ALJ offered a variety of valid reasons for discounting his credibility. First, the ALJ considered the objective medical evidence in the record. *See* 20 C.F.R. § 404.1529(c)(2) (objective medical findings are useful in assessing the intensity and persistence of a claimant's symptoms); *see also Walters*, 127 F.3d at 531

13

(discounting credibility appropriate where ALJ finds contradictions between claimant's testimony and the record). The ALJ acknowledged that Plaintiff has a medically determinable physical impairment that could reasonably be expected to produce some symptoms, but found that the objective evidence did not support Plaintiff's contention that these symptoms are so severe that he is unable to work. This conclusion is supported by substantial evidence.

First, Plaintiff received minimal treatment for his visual impairments. (*See* R. at 266-309.) While Plaintiff's medical records indicate that he reported blurred vision, shadows, floaters, occasional flashes, photophobia, and itchiness, no doctor prescribed any treatment for these symptoms, noted the severity of these symptoms, or recommended further testing to determine the severity of these symptoms. Further, on December 5, 2011, Dr. Justice noted that Plaintiff was "doing well," and on December 6, 2011, he noted Plaintiff was "doing great." (R. at 278, 280.) Thus, after Plaintiff's cataract surgery, Dr. Justice did not note that Plaintiff was suffering from residual symptoms such as floaters, flashes, and depth perception difficulties. (R. at 278.)

Additionally, Dr. Yoest, despite Plaintiff's reports of flashes, floaters, and depth perception difficulties, concluded that Plaintiff is able to avoid ordinary hazards, read ordinary newspaper or book print, view a computer screen, and determine differences in shape and color of small objects such as screws, nuts or bolts. (R. at 288.) Dr. Yoest also found that Plaintiff can shop; travel without a companion; ambulate without using a wheelchair, cane, or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare

14

simple meals and feed himself; can care for his personal hygiene; and can sort, handle, and use papers and files.  (R. at 290.)

Further, while the ME indicated that Plaintiff's floaters and depth perception issues have an explainable, medical basis, he also testified that the record does not contain sufficient medical evidence from which he could conclude that Plaintiff's symptoms are as limiting as he suggests. The ME indicated that while floaters are a "real problem," they are a common problem and most affected individuals are able to function sufficiently and maintain employment.  The ME pointed out that the record lacks objective findings or treatment notes related to the severity of Plaintiff's alleged symptoms.  Plaintiff contends, however, that the reason there is no objective evidence in the record is because no "test" exists to identify the severity of his alleged symptoms.  The Undersigned finds Plaintiff's contention unavailing, as the ME testified that a retinal specialist is able to conduct testing to determine the severity of damage to the vitreous.  (R. at 51.)  Because no objective evidence related to the severity of Plaintiff's condition exists in the record, the ME could not opine on the limiting effects of the symptoms Plaintiff described.  Given the lack of objective evidence, the Undersigned defers to the ALJ's findings related to Plaintiff's credibility. *See Walters*, 127 F.3d at 531 ("The absence of sufficient objective medical evidence makes credibility a particularly relevant issue, and in such circumstances, this court will generally defer to the Commissioner's assessment when it is supported by an adequate basis.")

Further, the ALJ also provided additional reasons for discounting Plaintiff's credibility. For example, the ALJ cited the minimal treatment Plaintiff received and lack of prescription for sunglasses as bases for suggesting that Plaintiff is not as limited visually as he claims to be. These are proper considerations.  *See* SSR 96-7P, 1996 WL 374186 (Jul. 2, 1996) (explaining

15

that an adjudicator must consider "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes" and the "treatment, other than medication, the individual receives").

The ALJ also properly considered Plaintiff's activities of daily living in determining his credibility. *See Walters*, 127 F.3d at 532 (finding that "an ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.") The ALJ concluded that Plaintiff's daily activities are "not restricted to the extent that he would be precluded from the range of work assessed herein. The [Plaintiff] is able to read, use a computer, cook, clean, and take care of his own personal hygiene. He stated he has not driven a car since 2008." (R. at 28.) These findings are supported by evidence in the record and further indicate that Plaintiff is not as limited as he claims. (R. at 234, 290, 76.)

For the above-stated reasons, the Undersigned declines to disturb the ALJ's credibility analysis. The Sixth Circuit has stressed that an ALJ is in the best position to evaluate a witnesses' credibility. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 418 (6th Cir. 2011). For this reason, an ALJ's credibility assessment will not be disturbed "absent a compelling reason." *Id.* Plaintiff has not demonstrated a compelling reason to disturb the ALJ's credibility assessment in this case. Accordingly, the Undersigned RECOMMENDS that Plaintiff's Statement of Errors be **OVERRULED**. (ECF No. 11.)

## VII. CONCLUSION

For the reasons above, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and the Commissioner of Social Security's Decision be **AFFIRMED**.

16

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 2, 2015                                          /s/ *Elizabeth A. Preston Deavers*
                                                                         Elizabeth A. Preston Deavers
                                                                         United States Magistrate Judge